UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JOSHUA LEE MCGIBONEY, | Case No.1:13-cv-00214-REB |
| Plaintiff, | **MEMORANDUM DECISION AND ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT AND MOTION TO STRIKE** |
| vs. | |
| CCA WESTERN PROPERTIES, INC., et al., | |
| Defendants. | **(Docket Nos. 41, 42, and 46)** |

Pending in this case are a Motion for Summary Judgment filed on behalf of Defendant David Agler M.D. (Dkt. 41), a Motion for Partial Summary Judgment filed by Plaintiff Joshua McGiboney (Dkt. 42), and finally, a Motion to Strike (Dkt. 46). All parties have consented to the jurisdiction of a United States Magistrate Judge. Having reviewed the record, and having entertained oral argument on December  3, 2015, the Court now enters the following Order.

## BACKGROUND

This is a prisoner civil rights case involving claims arising under the Eighth Amendment to the United States Constitution for alleged medical deliberate indifference. Plaintiff Joshua Lee McGiboney ("McGiboney") suffers from a rare and, in his case, inoperable neurological condition in his spinal cord known as an arteriovenous malformation or "AVM." An AVM is a "tangle of abnormal blood vessels in or near the

spinal cord...."[1] In May of 2011, McGiboney's AVM began to bleed, and the distorted blood vessels began to push on his spinal cord, causing partial paralysis in his leg and part of his abdomen. (Agler Decl. Dkt. 41-3, ¶ 20). McGiboney claims that Dr. Agler was deliberately indifferent to McGiboney's welfare in the treatment he received for this condition. Though Dr. Agler was involved in McGiboney's care from May of 2011 until approximately October of 2012, the issues at play in the current motions require the Court to focus on two specific time frames: first, the period between May 12, 2011 and May 23, 2011, which was when Dr. Agler first understood that McGiboney had previously been diagnosed with an AVM, and second, the period running from approximately April through October of 2012, when McGiboney's condition began to worsen after an initial improvement. For the following reasons, the Court concludes that there are issues of fact on the question of whether Defendant acted with deliberate indifference during these time frames, and will therefore deny both motions for summary judgment.

## FACTS

Plaintiff Joshua McGiboney is an inmate at the Idaho State Correctional Center ("ISCC"). During the time of the events giving rise to this lawsuit, ISCC was known as the Idaho Correctional Center ("ICC") and was operated by a private contractor, the Corrections Corporation of America, under contract with the State of Idaho.

---

[1] *See* http://www.mayoclinic.org/diseases-conditions/spinal-arteriovenous-malformations/basics/definition/CON-20036382. (January 11, 2016).

MEMORANDUM DECISION ON PENDING MOTIONS  - 2

On May 12, 2011, McGiboney was seen in the medical unit of ICC, after reportedly falling to the floor when he was overcome by pain. (Agler Decl. ¶ 10, Dkt. 41-3).[2] When he was seen at the medical unit, he was complaining of back spasms, pain, and numbness and weakness in his legs. Dr. Agler examined McGiboney and conducted certain tests in order to ascertain McGiboney's level of sensation and function in the areas where he was experiencing symptoms. Some, though not all, of these objective findings were consistent with McGiboney's subjective complaints of pain, numbness, and weakness. Because of the equivocal nature of the objective findings, Dr. Agler suspected that McGiboney was exaggerating his symptoms somewhat. However, he also concluded that the pain McGiboney claimed to be experiencing was legitimate, diagnosed McGiboney with a back spasm, and prescribed Toradol and Valium for pain and anxiety. (*Id.* ¶¶ 10-13).

At some point during this May 12 visit to the medical unit, McGiboney told another provider that he had previously been diagnosed with an AVM. This fact from his medical history was noted in his chart at 3:10 p.m. that afternoon. (Dkt. 41-4 at 47). Dr. Agler, however, says he was not aware of McGiboney's history of AVM at any point that day. (Agler Aff., Dkt. 41-3 ¶ 19).  Approximately half an hour after the AVM entry was made in McGiboney's chart, Dr. Agler wrote the following chart note:

---

[2]  All internal page citations refer to the page numbers generated by the Court's internal electronic case filing or "ECF" system. In the case of deposition testimony, corresponding page citations to the transcript itself are also provided.

MEMORANDUM DECISION ON PENDING MOTIONS  - 3

> Based on normal sensation and reflexes I believe that the pt. [patient] is malingering. I've advised him to continue to stretch his low bac & legs as much as possible now. If he is unable to walk, will plan to keep in medical o/n [overnight]. No indication for imaging as sxs [symptoms] are continuing to improve.

McGiboney (Dkt. 41-4 at 47). Later on in the afternoon McGiboney's vital signs were improving somewhat, and Dr. Agler left for the day. (*Id.*, at 46.)

Late in the afternoon of May 12th, McGiboney was moved to a medical isolation cell to make room for another inmate. (Dkt. 41-4 at 46). Nurses' notes from this time frame state that McGiboney was upset and loudly requesting that someone call his neurosurgeon. *Id.* The chart note indicates that the nurses who observed McGiboney that afternoon felt he was exhibiting signs of malingering – for example, moving his legs more when he believed no one was looking.  The same note states that McGiboney would be "clear to go to housing when ambulatory." *Id.* The final chart note for that day indicates that McGiboney was again seen moving his legs, but appeared very agitated and was still complaining of numbness though he had full sensation. *Id.* at 45.

Around 8 p.m that evening, for reasons not explained in the medical record, McGiboney left the medical unit. Around that same time, some sort of incident or altercation also occurred that ultimately led to his being placed in segregation and issued a disciplinary offense report ("DOR"). It is not clear what precipitated this incident, because chart notes for this time period apparently do not exist. Further, neither party has submitted affidavit or deposition testimony describing what happened in that time period.

MEMORANDUM DECISION ON PENDING MOTIONS  - 4

However, the DOR itself states that McGiboney became very combative with ICC staff, that he refused to walk and also refused to leave the medical unit. The responding officer, who prepared the DOR, writes:

> On Thursday, 05-12-11, at 20:15, I responded to Medical in regards to an Inmate that the Medical Officer could not get to leave Medical and return to his housing unit. Inmate McGiboney had been in Medical since early afternoon, at 2000, McGiboney was still in Medical after being seen by RN Purkiss. She listened to him and called Dr. Agler on the phone and Dr. Agler re-confirmed his earlier diagnosis and ordered that Inmate McGiboney be returned to his housing unit. Inmate McGiboney continually repeated his claims that he could not walk and I explained to him that I could not offer him the services of a wheel chair as our institution's Medical expert told us that he did not need a wheel chair. McGiboney then began repeatedly demanding the use of the telephone. He demanded that I let him make a phone call at least 30 times. I told him no each time.

*Id.* at 26.

The DOR also contained a report that McGiboney had demanded to know when the responding officer was "going to stop being an asshole," at which point the officer placed him in restraints and led him to a segregation cell.  (*Id.*). Further, the content of the DOR implies that Dr. Agler, in consultation with Nurse Purkiss, may have determined that McGiboney was malingering and thus decided to discharge him from the medical unit.  However, Dr. Agler had no independent recollection of having participated in the phone conversation referenced in the DOR. (Agler Depo. at 158, found at Dkt. 42-3, ECF page 16).

McGiboney remained in segregation for the next 11 days, in a non-handicap accessible cell. On the night of May 15, 2011, he filled out an "Offender Concern Form,"

MEMORANDUM DECISION ON PENDING MOTIONS  - 5

stating that he needed to go to the hospital. He also explained that since the onset of the "muscle spasm," the entire left side of his body was not working from the chest down and that he was in excruciating pain. In this concern form, McGiboney also raised the issue of deliberate indifference, and requested that he be seen by a different doctor and/or transferred to a medical facility. (Dkt. 42-3, p. 5). Dr. Agler reviewed the concern form on May 17, 2011 and wrote "I'm sorry you're having these issues. I will call you down to be seen very soon to discuss these issues further."  Dr. Agler's order from that same day states "follow up in one week re: left side not working." (41-4 at 26).

During his time in segregation, McGiboney was not seen by any medical care provider. (Agler depo. at 174-175, located at Dkt. 42-3 page 20).

On May 23, 2011, McGiboney returned to the ICC medical unit and was seen by Dr. Agler. According to Dr. Agler, it was during this visit that he learned for the first time that McGiboney had a history of AVM. (Agler Decl. Dkt. 41-3, ¶ 19). While Dr. Agler still believed that it was unlikely that McGiboney was experiencing an AVM event and still believed that he was malingering, he did note that an AVM could account for some of McGiboney's symptoms. (*Id.* at 21). Accordingly, Dr. Agler decided that it was necessary to get a CT scan of McGiboney's thoracic and lumbar spine. In the email he sent to his supervisors to obtain authorization for the CT scan, Dr. Agler reiterated his belief that McGiboney was malingering, but explained that he wanted to obtain a CT scan in order to rule out the possibility of AVM, as well as to "cover himself." (Dkt. 41-8 at 1). When the CT scan was obtained, nearly two months later, it showed that McGiboney had

MEMORANDUM DECISION ON PENDING MOTIONS  - 6

a likely bleed associated with an AVM near his T7-8 vertebrae. (Agler Aff., Dkt. 41-3 at ¶ 32). In September of 2011, about two months after the AVM was identified, Dr. Agler put a standing order into McGiboney's case file, requiring that he be seen on a monthly basis to monitor what appeared to be a very tenuous condition. (Dkt. 41-4 at p. 23).

In August of 2012, after the fact of the AVM was identified, Dr. Agler worked to obtain a consultation for McGiboney with an outside specialist provider.  In August, McGiboney was seen by a neurologist, Dr. Wilson, who recommended a neuro-surgical consultation. (Agler Decl., Dkt. 41-3 ¶ 35). Dr. Agler then sought to find a neurosurgeon who could see McGiboney.  The first neurosurgeon that was contacted said he was no longer accepting inmate patients. Arrangements were made for McGiboney to see a different neurosurgeon, Dr. Ronald Jutzy, but Dr. Jutzy was out of the country at the time. (*Id.* ¶¶ 36-38).  Ultimately, McGiboney was seen by Dr. Jutzy, but not until November 15, 2011.[3]  In a letter report back to Dr. Agler dated that same day, Dr. Jutzy opined that McGiboney's case presented "a very difficult ethical problem medically, financially, and sociologically." (Dkt. 41-5 at 64). Dr. Jutzy also said that because McGiboney's condition was slowly improving at that time, he was "not being harmed by no current treatment being given to the arteriovenous malformation [the "AVM"]." However, Dr. Jutzy also stated:

---

[3] Though it took nearly four months for McGiboney to be seen by a neurosurgeon after the AVM was diagnosed, his counsel conceded at oral argument that this delay was "arguably acceptable," due to the difficulty of identifying a provider and due to the fact that McGiboney was improving somewhat during this time frame.

MEMORANDUM DECISION ON PENDING MOTIONS  - 7

> The dilemma in this case is that this is apparently a lesion that is likely to cause him progressive deficits, including pain, numbness and weakness of his lower extremities, including also loss of bowel, bladder or sexual function. It is only involving his left leg with very little bladder, bowel or sex and no right leg function as I can test on examination today; but if he should bleed again, I think these are all in jeopardy.

*Id.*

When Dr. Agler received this report, he immediately emailed ICC's Warden, Assistant Warden, Regional Medical Director, and Health Services Administrator to update them on the growing complexity of the case. Referring to McGiboney, Dr. Agler said:

> The bottom line is we need to determine what [procedures] we are going to authorize. On the one hand he is getting a little better but may have another episode at any time that makes him significantly and permanently worse. On the other hand, the diagnostics and interventions are not only very costly, but dangerous in their own right and may not even yield a result that improves his current function and pain.

(Dkt. 41-8 at p. 3). Ultimately, McGiboney had exploratory surgery under the direction of Dr. Jutzy, which occurred on March 13, 2012. Unfortunately, because of a large blood supply that was feeding the AVM, the doctor who performed the surgery felt it was too dangerous to continue. After the exploratory procedure Dr. Jutzy informed Dr. Agler that no further surgery was indicated. (Agler Decl., Dkt. 41-3 at ¶ 53 & Dkt. 41-4 at 34).

In the midst of all these things, and although his providers could not identify a safe surgical solution for his difficulties, McGiboney's symptoms did appear to improve somewhat during late 2011 and the early part of 2012. Chart notes from October and November of 2011 indicate that McGiboney's pain situation was improving in response

to the medications Dr. Agler had prescribed. (Agler Decl. ¶¶ 40-42 and Dkt. 41-4 at 38-39). On February 29, 2012, McGiboney and Dr. Agler had a disagreement about whether McGiboney's condition required narcotics.  According to Agler, McGiboney became combative (Agler Dec. ¶ 51), but less than a month later McGiboney informed Dr. Jutzy that he was doing well. (Dkt. 41-4 at p. 33).

In April of 2012, however, McGiboney's condition began to deteriorate. During an appointment with Dr. Agler on April 24, 2012, McGiboney said that the symptoms in his right leg had worsened, that his leg was now buckling, that his left foot twitched and flexed involuntarily, and that he was having increased urinary incontinence. He also reported that occasionally "his whole body [was] getting stuck." (Dkt. 41-4 at p. 32). Because of these new symptoms, Dr. Agler ordered that McGiboney be seen "ASAP" by Dr. Jutzy. *Id.*

Two days later, on April 26, Dr. Agler was informed that Dr. Jutzy was out of the country and that his return date was uncertain.  Dr. Agler ordered that McGiboney be scheduled with Dr. Jutzy after Dr. Jutzy returned.  He also ordered that McGiboney be informed of the status of the effort to have him seen by Dr. Jutzy and that McGiboney be told to submit a Health Services Request form if his condition worsened. (Agler Decl. ¶ 58 & Dkt. 41-4 at p. 16).

On May 3, 2012, Dr. Agler was able to speak to Dr. Jutzy via telephone about McGiboney's worsening symptoms.  Dr. Jutzy described these symptoms as being "just a gradual slide," presumably in reference to McGiboney's worsening medical condition.

MEMORANDUM DECISION ON PENDING MOTIONS  - 9

(Dkt. 41-10 at 2).

After the April 24, 2012 clinic visit with Dr. Agler, Physicians' Order Sheets from ICC's medical records for McGiboney indicate that during the late spring and summer of 2012 various ICC providers, including Dr. Agler, renewed McGiboney's prescriptions and made some adjustments to his medication regimen.(Dkt. 41-4 at 13-15). In May of 2012, Dr. Agler also communicated with correctional officers at the prison regarding the status of McGiboney's request for medical parole. On June 3, 2012,  Dr. Agler also sent a follow-up email inquiring as to the status of arrangements for the Jutzy appointment.[4] During this time, Dr. Jutzy was also having McGiboney's radiography films reviewed by other Boise neurosurgeons to determine if a surgical solution could be identified. (Dkt. 41-10 at 1). Even so, McGiboney was not seen by Dr. Agler, or any other medical care provider at ICC, for nearly five months–from late April until mid-September of 2012. (Dkt. 41-4 at p. 30). This delay may have been in part due to staffing issues, though neither party explores that issue in their briefs. (Dkt. 47-3, p. 28-29).

McGiboney has submitted an affidavit describing his symptoms during this time frame, based on notes that he took contemporaneously. (Dkt. 47-2). During May of 2012, McGiboney says he was in significant pain, indicates that at one point he fell in the shower when his leg gave out, and further, states that his entire body "locked up" on one occasion. Several days later, on May 25, 2012, he alleges that he could not get out of a

---

[4] The Court cannot determine whether the inquiry was directed to Dr. Jutzy's office, or to Dr. Agler's supervisors.

chair.  Instead of helping him, McGiboney says that correctional staff mocked and harassed him. (*Id.* ¶ 9). On June 1, 2012, McGiboney was in a dispute with a correctional officer on duty about whether he could walk or not, and McGiboney alleges that he slipped and fell while trying to clean feces and blood out of his cell. (*Id.* ¶ 12).

From June 28 to July 10, McGiboney says his condition was  "extremely bad." He states that his vision was blurry, that his brain was "not working like normal," and that he lay in bed so long that he lost track of days. He claims that no matter who he asked, no one would help him. (*Id.* ¶ 5). In late August, he fell in the shower again, and spent a week lying in bed with feelings of hotness, numbness and weakness in his legs and pain at a level of 9 to 10. By August 30, McGiboney couldn't feel his legs. He alleges that no one responded to his health services requests during these time frames, and that the receipts showing that he had made these requests were taken from him by guards in October of 2012. (*Id.* ¶¶  19- 22 & 28).

Dr. Agler next saw McGiboney on September 14, 2012, and informed him that, according to Dr. Jutzy, no local surgeon would perform surgery to correct his AVM because of the high risk of paraplegia from such a procedure. (Agler Decl. ¶ 15). During that visit, Dr. Agler continued McGiboney's prescriptions for Ultram and Neurontin (pain medications), ordered that McGiboney be seen every three months unless his symptoms changed, and that he continue to receive physical therapy. (Agler Decl. ¶ 61).

In October of 2012 McGiboney experienced a sub-arachnoid brain bleed, and was taken to the emergency room. The doctor who treated him there was also of the opinion

that surgery to treat the AVM was too risky. (*Id.* at 58).

## LEGAL STANDARDS

### 1.    Summary Judgment

Summary judgment is appropriate where a party can show that, as to a particular

claim or defense, "there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal

purposes of the summary judgment rule "is to isolate and dispose of factually unsupported

claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is not "a

disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually

insufficient claims or defenses [can] be isolated and prevented from going to trial with the

attendant unwarranted consumption of public and private resources." *Id. at 327*.

"[T]he mere existence of some alleged factual dispute between the parties will not defeat

an otherwise properly supported motion for summary judgment ...." *Anderson v. Liberty*

*Lobby, Inc.,* 477 U.S. 242, 247-48 (1986). Rather, there must be no genuine dispute as to

any material fact in order for a case to survive summary judgment. Material facts are

those "that might affect the outcome of the suit." *Id*. at 248. Disputes over facts that are

not material to the resolution of the motion will not preclude summary judgment. *T.W.*

*Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The moving party is entitled to summary judgment if that party shows that each

material fact cannot be disputed. To show that the material facts are not in dispute, a party

may cite to particular parts of materials in the record, or show that the adverse party is

unable to produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(A) & (B). The Court must consider "the cited materials," but it may also consider "other materials in the record." Fed. R. Civ. P. 56(c)(3).

If the moving party meets its initial responsibility, then the burden shifts to the opposing party to establish that a genuine dispute as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). The existence of a scintilla of evidence in support of the non-moving party's position is insufficient. Rather, "there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson,* 477 U.S. at 252.

## ANALYSIS

**1.      Motion to Strike**

The Court will first address Plaintiff's Motion to Strike the last sentence of Paragraph 59 of Dr. Agler's Declaration. (Dkt. 46). Paragraph 59 is Dr. Agler's description of a telephone conversation on May 3, 2012 between Dr. Agler and Dr. Jutzy, in which they discussed McGiboney's worsening symptoms, which Dr. Jutzy characterized at that time as a "gradual slide." In the last sentence of that paragraph Dr. Agler states that "Dr. Jutzy did not recommend any follow up or additional treatment." (Agler Decl., Dkt. 41-3 at ¶ 59). McGiboney contends that this sentence contains inadmissible hearsay, and further, that it is not consistent with the note that Dr. Jutzy made of the conversation he had with Dr. Agler.

The  Court will grant the motion to strike, for purposes of these summary

judgment motions only. Defendant's primary argument on this issue is that the sentence is admissible as a non-hearsay "statement" that helps demonstrate that Dr. Agler did not act with the state of mind necessary to establish a deliberate indifference claim. In other words, the defense argues, Dr. Jutzy's silence on the subject of the necessity of further treatment can be used to establish that Dr. Agler had a reasonable basis for failing to provide additional treatment during April to October of 2012. While silence or other non-verbal conduct can be a "statement" for purposes of the hearsay analysis, Rules 801 of the Federal Rules of Evidence explicitly requires that the declarant must actually intend his statement (even if it consists of silence) as an assertion. Here, there is no evidence suggesting that Dr. Jutzy intended his silence on the question of follow-up treatment to be taken as an assertion that no treatment was necessary.[5]

For these reasons, the motion to strike is granted. This ruling, however, is for purposes of the present dispositive motions only. It is possible that the foundation necessary for meeting Rule 801's requirements can be put forward at trial.

## II.   Substantive Eighth Amendment Issues–Defense Motion (Dkt. 41)

The Eighth Amendment includes the right to adequate medical care in prison, and prison officials or prison medical providers can be held liable for Eighth Amendment

---

[5] In his letter of November 15, 2011, Dr. Jutzy did state that McGiboney was not being harmed by the lack of follow-up treatment. (Dkt. 41-5 at p. 63). This statement cannot be used to infer what Dr. Jutzy might have thought about the necessity of follow up treatment six months later, when McGiboney's clinical picture had changed significantly.

violations if their "acts or omissions [were] sufficiently harmful to evidence deliberate

indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). A

prison official or prison medical provider acts with "deliberate indifference . . . only if the

[prison official] knows of and disregards an excessive risk to inmate health and safety."

*Gibson v. Cnty. of Washoe*, 290 F.3d 1175, 1187 (9th Cir. 2002) (citation and internal

quotation marks omitted).

      The Ninth Circuit has defined a "serious medical need" as:

> failure to treat a prisoner's condition [that] could result in
> further significant injury or the unnecessary and wanton
> infliction of pain[;] . . . [t]he existence of an injury that a
> reasonable doctor or patient would find important and worthy
> of comment or treatment; the presence of a medical condition
> that significantly affects an individual's daily activities; or the
> existence of chronic and substantial pain . . . .

*McGuckin v. Smith,* 974 F.2d 1050, 1059-60 (9th Cir. 1992) (internal citations omitted),

*overruled on other grounds*, *WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997)

(en banc). In the medical context, to prove that a defendant acted with deliberate

indifference the plaintiff must show both "a purposeful act or failure to respond to a

prisoner's pain or possible medical need and . . . harm caused by the indifference." *Jett v.

Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006). Deliberate indifference can be "manifested

by prison doctors in their response to the prisoner's needs or by prison guards in

intentionally denying or delaying access to medical care or intentionally interfering with

the treatment once prescribed." *Estelle*, 429 U.S. at 104-05 (footnotes omitted). If an

inmate demonstrates that prison officials have acted with the requisite state of mind, the inmate "need not show his harm was substantial; however, such would provide additional support for the inmate's claim that the defendant was deliberately indifferent to his needs." *Jett,* 439 F.3d at 1096. However, a mere delay in treatment does not constitute a violation of the Eighth Amendment unless the delay causes further harm. *McGuckin*, 974 F.2d at 1060. If medical personnel have been "consistently responsive to [the inmate's] medical needs," and there has been no showing that the medical personnel had "subjective knowledge and conscious disregard of a substantial risk of serious injury," there has been no Eighth Amendment violation. *Toguchi* v. *Chung*, 391 F.3d 1051, 1061 (9th Cir. 2004).

Here, there is no question that McGiboney's AVM along with the pain, numbness, and partial paralysis it engendered constituted a serious medical need. Further, for the reasons described to follow, there are genuine issues of material fact with respect to the remaining two elements necessary to establish an Eighth Amendment claim, that is, "a purposeful act or failure to respond to a prisoner's pain or possible medical need and . . . harm caused by the indifference." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006). This is true both with respect to McGiboney's original infirmary visit on May 12, 2011, and with respect to the events that occurred beginning in early 2012, when McGiboney's

condition began to worsen after initially improving somewhat.[6]

### A.   Initial Clinic Visit on May 12, 2011

Various facts in the record, considered in the light most favorable to McGiboney, could permit a reasonable jury to conclude that Dr. Agler acted with deliberate indifference during McGiboney's initial clinic visit on May 12, 2011. Although Dr. Agler diagnosed McGiboney with a back spasm and prescribed Toradol and Valium on that day, he also believed there was a significant component of malingering or exaggeration in his clinical  presentation. When he was deposed, Dr. Agler testified extensively about what the standard of care requires when a doctor suspects that a patient is malingering. He explained that in such a case, a doctor cannot simply not treat the patient, but rather must assess the patient to either confirm or rule out a diagnosis of malingering. (Agler depo. at p. 147-148 & 155, located at Dkt. 42-3, pages 14-15). On the afternoon of May 12, 2011, Dr. Agler ordered that McGiboney was to remain in the medical unit overnight unless he could walk. Yet, for reasons that are not made clear in the record, McGiboney was discharged just a few hours later. The only evidence in the record that even hints at what happened is the DOR prepared by the officer who responded when McGiboney refused to leave the medical unit. The medical records themselves are silent as to the basis for the discharge decision, and Dr. Agler had no independent memory of these events.

An inmate may establish a claim for deliberate indifference if prison officials

---

[6]  Plaintiff concedes that Dr. Agler's care from November of 2011 until about February of 2012 was medically reasonable. (Opposition Brief, Dkt. 47, at p. 2).

disregard a doctor's orders or fail to provide an inmate with prescribed therapies. Prison officials have also been held to be deliberately indifferent to a prisoner's medical needs when they interfere with treatment once it is prescribed. *Estelle v. Gamble,* 429 U.S. at 104-105; *See also, Hamilton v. Endell,* 981 F.2d 1062, 1066 (9th Cir. 1992) (overruled on other grounds as stated in *Estate of Ford v. Ramirez-Palmer,* 301 F.3d 1043 (9th Cir. 2002); *Ortiz v. City of Imperial,* 884 F.2d 1312, 1314 (9th Cir. 1989). With no explanation in the medical records as to why McGiboney was discharged on the night of May 12, 2011 despite Dr. Agler's order of earlier that same day, a reasonable jury could infer that Dr. Agler contradicted his *own* orders. A reasonable jury could also conclude that Dr. Agler knowingly violated his own standard of care, because he testified at his deposition that even if a doctor suspects malingering, it is not medically acceptable to do nothing. This sort of conduct, if proved, would demonstrate a purposeful act or knowing failure to respond to a prisoner's pain.

Turning to the question of harm, it should first be emphasized what this case does *not* involve, at least on the record currently existing. There is no evidence in the record to suggest that the serious deficits that have befallen McGiboney – the partial paralysis, the brain bleed, and the overall weakness and numbness and one side of his body – are attributable to any act or omission on Dr. Agler's part. McGiboney's counsel suggested at oral argument that a reasonable jury could infer that the brain bleed he experienced in October 2012 was due to the lack of treatment during the preceding five months, but such complex questions of

medical causation require expert testimony, even in a section 1983 case. *See e.g.,*
*Robinson v. Hagar,* 292 F.3d 560, 564 (8th Cir. 2002); *Rogers v. Evans,* 792 F.2d 1052,
1058 (11th Cir. 1986); *Scott v. MTA Keller,* 2010 WL 3635728 at * 6 (E.D. Cal. 2010).
Therefore, to the extent that McGiboney may be trying to argue that his most dramatic
deficits – the brain bleed and increasing paralysis – are  evidence of harm attributable to
Dr. Agler, he has simply fallen short.

However, the Ninth Circuit does not require evidence of  substantial or dramatic
harm in order to establish a claim for deliberate indifference. *Jett v. Penner,* 439 F.3d at
1096. Instead, harm may be found in the very fact that a patient was forced to endure
unnecessary pain. *McGuckin v. Smith,* 974 F.2d at 1062. This is true even if the underlying
condition may ultimately not be curable. *See, e.g.,  Russell v. Williams*, 2008 WL 4974801 at *4
(S.D. Georgia 2008) (incurability of condition  "does not relieve a prison system of its obligation
to provide palliative care."); *Washington v. Dugger,* 860 F.2d 1018, 1021 (11th Cir.1988)
(Eighth Amendment violation may be established, even if a cure is not possible, if certain
treatments eliminate pain and suffering at least temporarily.)

While he was in segregation after being discharged from the medical unit on May
12, 2011, McGiboney went without any medical attention for multiple days, all the while
experiencing a dangerous and painful neurological event that had been diagnosed as a
back spasm. McGiboney may have received pain medication during some part of this
time period (he had received an injection of Toradol and Valium on the afternoon of May
12), but another reasonable inference from the evidence is that he did not receive the

MEMORANDUM DECISION ON PENDING MOTIONS  - 19

same level of attention or care that later came his way after Dr. Agler realized that an AVM was a realistic possibility.

The medical records and Dr. Agler's affidavit also indicate that McGiboney's pain medications were increased after the May 23, 2011 appointment, when Dr. Agler learned about McGiboney's history of AVM. These same sources indicate another increase in dosages after the CT scan confirmed the AVM diagnosis. (Agler Decl. Dkt. 41-3 ¶¶ 24, 28 & 33). Further, other evidence in the record–from Dr. Agler's affidavit itself, as well as the records of Dr. Wilson and Dr. Jutzy – indicated that the treatment McGiboney later received afforded him some relief. This evidence is sufficient to create an issue of fact on the harm prong of the deliberate indifference test, as to the events that occurred in May of 2011.

> **B.      Whether There Was a Purposeful Failure to Respond to Serious Medical Need During April to October of 2012.**

There is also sufficient evidence, albeit contested, from which a jury could conclude that Dr. Agler acted with deliberate indifference during the time period, beginning in April of 2012, when McGiboney went for nearly five months without receiving medical attention.

There is no doubt that by the beginning of that period, Dr. Agler was aware of the seriousness of McGiboney's condition. Dr. Jutzy told Dr. Agler in November of 2011 that McGiboney's AVM lesion could bleed again at any time, and that such an occurrence would likely cause progressive deficits including increased pain, numbness and weakness

in the lower extremities, as well as loss of bowel, bladder, and sexual function. (41-6 at p. 63).

Nonetheless, despite the fact that his primary medical care provider was aware of the seriousness and instability of his condition, the record could support a conclusion that McGiboney was forgotten by the prison medical staff from approximately late April until mid-September of 2012. During this time, he was not examined by any medical provider–at ICC or elsewhere, despite the fact that Dr. Agler's standing order called for him to be seen monthly. Under that measurement, he should have been seen at least four times during that time frame.  McGiboney also alleges that during this time frame he continually asked for help but that his requests fell on deaf ears. While not all of these requests may have been directed to Dr. Agler, at least two of them were. At some point in the early part of 2012, McGiboney requested medical parole and/or a transfer to another facility, due to a patient/doctor relationship conflict he perceived with Dr. Agler.  Dr. Agler denied the request. (Dkt. 47-3 at ¶ 24). Emails between Dr. Agler and correctional staff in middle of May reference McGiboney's request, and in one such email Dr. Agler stated, "I think the major conflict is that he doesn't like me [because] I'm not giving him the drugs he wants." (*Id.*).

Also relevant to the question of what Dr. Agler may have known about McGiboney's condition during this time frame is a May 30, 2012 Health Services Request ("HSR") form McGiboney filled out, in which he asked, "what is the status of

Dr. Jutzy? I'm still waiting to hear back from the conference. Is a visit scheduled? I'm in

pain and I want to fix this." (Dkt. 41-6 p. 6). Dr. Agler did follow up on what was

happening with the request for an appointment with Dr. Jutzy, but he did not schedule

McGiboney for an appointment with himself or another provider in the ICC unit. It would

still be over three months before  Dr. Agler–or any provider–saw McGiboney, who had

said that he was in pain, and despite the standing order indicating that McGiboney was to

be see on a monthly basis.[7]

Viewed in a light favorable to McGiboney, the emails between Dr. Agler and

correctional staff also support the claim of deliberate indifference. In addition to the

emails about the request for medical parole described above, Dr. Agler also exchanged

emails with correctional officer Wade Cheney on August 22, 2012. Officer Cheney

initiated the exchange, asking Dr. Agler, "Is this guy [McGiboney] on your radar at all to

be seen? He's claiming to have sent multiple HSRs and Concern Forms requesting 'to see

the doctor' about an existing medical condition that he claims to have come here with

from ISCI." (Dkt. 47-3 at 28- 29). Dr. Agler responded, "He is looking for pain

medication. He is on the schedule to be seen. We are in the middle of a big push to see as

many patients as possible to get caught up. While we are behind, that should improve

soon."  (*Id*). At a minimum, these emails show that Dr. Agler was aware of McGiboney's

---

[7] Dr. Agler argues that because this HSR was a request for off-site treatment, he may not have ever seen the actual request, including McGiboney's claim that he was in pain. It is clear, however, that Dr. Agler was the one to follow up on the request, so questions surrounding whether he did or did not see it are for a jury to decide.

MEMORANDUM DECISION ON PENDING MOTIONS  - 22

situation and desire for medical attention during the spring and summer of 2012. A reasonable trier of fact could view this evidence as supporting the idea that Dr. Agler acted with conscious disregard for McGiboney's worsening medical situation during that time frame.

### C.    Harm During the April to October 2012 Time Frame

Whether Plaintiff has pointed to sufficient harm flowing from the deprivation of medical care during this time period is a closer question, although here also the Court concludes that genuine issues of material fact preclude summary judgment. The record indicates that the medical professionals agree that the AVM is a serious, unstable, and potentially life threatening condition.  In McGiboney's case, it is also an incurable condition. The treatment options available to him are pain management and physical therapy. Surgery is apparently not a safe option for McGiboney, and, as explained above, there is no evidence that his subarachnoid bleed was caused by the lack of treatment during the spring and summer of 2012.

At the hearing, Plaintiff's counsel conceded that the record on the issue of additional harm flowing from the denial of medical treatment for this time period was "scant." She also acknowledged that it would be problematic to pin the harm element on a disagreement over McGiboney's pain medication regimen. This concession was an appropriate exercise in candor, and in any event a dispute about the appropriate course of treatment will rarely amount to deliberate indifference, especially when the treatment in question involves potentially addictive pain medications. *See, e.g. Dill  v. Correctional Med. Svcs,* 2013 WL 1314007 at *5 (D. Idaho

2013). Instead, when pressed on the issue at oral argument, counsel argued that harm was evidenced in two areas: 1) the failure to provide McGiboney with physical therapy (which could have helped to alleviate his pain) during the spring and summer of 2012, and 2) the harassment that McGiboney experienced at the hands of prison staff, which McGiboney contends was the product of emails from Dr. Agler minimizing the seriousness of his medical condition.

The record does reflect that McGiboney was evaluated by a physical therapist on December 5, 2011, who ordered physical therapy once per week for three weeks. He was seen by a physical therapist in accordance with this plan. (Agler Decl., Dkt. 41-3, at ¶¶ 48-49). In late December, Dr. Agler also ordered that McGiboney be fitted for an orthotic device, based on the physical therapist's suggestion. (*Id.* ). On February 29, 2012 Dr. Agler ordered additional physical therapy, (*Id.* ¶ 51). Dr. Agler also told McGiboney he would be receiving physical therapy on March 23, 2012, when he met with McGiboney after the exploratory surgery. (Dkt. 41-4 at p. 33).

Subsequently, however, the record indicates only one visit by McGiboney to a physical therapist, on April 28, 2012. It is unclear why the treatment did not continue through that spring and summer. There are hints of possible staffing issues, and on one occasion McGiboney actually refused physical therapy, apparently feeling that it might be dangerous unless he could first be evaluated by Dr. Jutzy. McGiboney also alleges that on two occasions in late July and early August of 2012, he tried to engage in physical therapy exercises on his own in the prison

MEMORANDUM DECISION ON PENDING MOTIONS  - 24

yard, but was stopped by correctional officers because he was on restriction.[8]  (McGiboney Decl., Dkt. 47-2 at  ¶¶ 15-17).

This entirety of such evidence, viewed for the benefit of the Plaintiff in this setting, is sufficient to suggest that the lack of medical attention during the April to October 2012 time frame may have effectively prevented McGiboney from receiving one of the only treatment options available that could have alleviated his situation somewhat. Accordingly, summary judgment is not warranted on the harm element of the deliberate indifference test for this time frame as well.

### D.    Whether Alleged Misconduct By Guards Constitutes Additional  Harm

McGiboney claims that Dr. Agler dismissed him as a "drug seeker" in emails with correctional officers, and that after doing so members of the prison staff interfered with his ability to obtain medical care in various ways. He alleges, for example, that correctional staff ignored his requests for help on numerous occasions, mocked him, implied that there was nothing wrong with him, and generally interfered with his ability to obtain medical care.

Such conduct on the part of correctional staff, if true, would be deplorable. Even so, the alleged mistreatment that McGiboney experienced at the hands of prison guards cannot aid McGiboney in developing the harm element of his deliberate indifference claim against Dr. Agler.

McGiboney's argument is analogous to those situations, common to prison litigation, in

---

[8] The record does not make clear if this restriction was due to medical or disciplinary reasons.

which an inmate claims prison officials unnecessarily exposed him to an unreasonable risk of

harm by third persons, for example, from an attack by another inmate. Therein, the governing

question is whether "the prison official knows of and disregards an excessive risk to inmate

health and safety." *See, e.g. Farmer v. Brennan,* 511 U.S. 825, 837 (1994). *See also,*

*Gibson v Washoe County,* 290 F.3d at 1187. Under this standard, the prison official must

"be aware of facts from which the inference could be drawn that a substantial risk of

serious harm exists," *and* "also draw the inference.'" *Toguchi v. Chung*, 391 F.3d 1051,

1057 (9th Cir. 2004). Thus, the question the Court must decide is whether any credible

evidence demonstrates that Dr. Agler had subjective knowledge that prison officials

would interfere with McGiboney's care because of the two emails in which Dr. Agler

indicated that McGiboney was seeking pain medication.

The answer is no. During the early part of 2012, McGiboney and Dr. Agler did, in

fact, have a dispute about pain medications. McGiboney wanted narcotics, and Dr. Agler,

even after the AVM had been diagnosed, did not feel they were appropriate. McGiboney

apparently became combative with Dr. Agler over this issue, to the point where Dr. Agler

had to end the meeting prematurely. In the weeks that followed, McGiboney requested

medical parole, due to his perceived conflict with Dr. Agler. Dr. Agler denied this

request. The second objectionable email communication did not occur until August 22,

2012, after which point most of the allegedly harassing behavior had occurred (though not

the alleged seizure of McGiboney's HSR receipts that occurred in October of 2012).

Dr. Agler testified in his deposition that it is important for prison medical providers to accurately communicate with correctional officers regarding an inmate's status, because how officers view an inmate can impact how they treat him. (Agler depo. at 103-104 & 151-152, located at Dkt. 47-3 pages 8- 9). There is a disconnect, however, between that statement and the ultimate harm McGiboney claims, because the alleged campaign of intimidation described by McGiboney, up to and including the allegations that guards seized receipts and failed to respond to his pleas for medical attention, cannot be traced back to Dr. Agler.  Further, the inferences McGiboney attempts to draw from the emails are not reasonable on the record that has been presented here. In the first place, the emails were not inaccurate , because, while they did not contain a complete recitation of McGiboney's medical history, they did convey Dr. Agler's assessment of his then-existing circumstances. There is no evidence that the guards who allegedly mistreated McGiboney were even aware of the emails. Further, during this time frame, McGiboney remained on ICC's Medical Watch List, essentially a list of inmates with serious medical conditions.

Accordingly, the causal nexus between the emails and the conduct of the prison officials that McGiboney describes is simply too thin to create an issue of fact as to whether Dr. Agler knew that his emails would create a substantial risk to McGiboney's health and safety. As a matter of law, such a claim simply does not hold water on the

record presented in this case. *Cf. Starr v. Baca,* 652 F.3d 1202 (2014) (discussing the type of evidence necessary to hold a county officials liable for inmate-on-inmate attacks). Therefore, while his emails may have some relevance to show what Dr. Agler knew about McGiboney's situation during the spring and summer of 2012, on the record presented here, they do not provide a basis for holding Dr. Agler liable for a campaign of harassment by ICC correctional officers.

### D.     Plaintiff's Motion for Summary Judgment

Finally, the Court also denies Plaintiff's Motion for Summary Judgment (Dkt. 42), which focuses on Dr. Agler's conduct from the evening of May 12, 2011 through May 23, 2011. The evidentiary basis for the motion comes down to two things: the Disciplinary Offense Report or "DOR" that was issued after McGiboney refused to leave the medical unit, and Dr. Agler's deposition testimony surrounding those events. As explained earlier, a reasonable jury could infer from the DOR that Dr. Agler contradicted his own orders on the night of May 12, 2011, and that he knowingly allowed McGiboney to be discharged from the medical unit without first establishing whether McGiboney could actually walk.

While the record contains many facts and suggests many inferences that support McGiboney's claim, there are also a numerous facts from which a reasonable jury could conclude that Dr. Agler did *not* act out of a reckless or callous disregard for McGiboney's pain on the night of May 12, 2011. To begin, AVM is a rare condition, and the objective findings from the examination that Dr. Agler conducted on that day were not consistent

with McGiboney's subjective complaints of pain, numbness and weakness. Further, Dr. Agler has said he was not aware of McGiboney's history of AVM until May 23, 2011, although another provider did note the AVM in the medical chart. When the evidence is viewed in his favor, Dr. Agler's actions after May 23, 2011 (i.e., obtaining a CT scan and specialist care) raise a reasonable inference that he did not know of the history of AVM before that date.

Next, even though no one questions that McGiboney suffers from a serious neurological condition, there is also evidence to suggest that there was a component of exaggeration to his behavior and suggestions of drug seeking at times. At a very minimum, a reasonable juror could conclude that McGiboney's behavior may very well have *looked* like malingering to someone in Dr. Agler's position, at a time when he had no knowledge of McGiboney's history of AVM. For example, the medical records from the afternoon of May 12, 2011 indicate that while McGiboney claimed to have significant neurological deficits and to be in excruciating pain, he quieted down when he believed he was not being observed. Correctional officers made similar observations while he was in segregation, for example, noting that he would scoot on his buttocks when he knew guards were looking, but that he would stand when he was unaware he was being observed. In hindsight, McGiboney's behavior, which may have appeared inconsistent to his care providers, may have actually stemmed from his understandable need to get

MEMORANDUM DECISION ON PENDING MOTIONS  - 29

attention for a very serious medical condition. But assessing his behavior during this time frame – and by the same token, making judgments about the adequacy of Dr. Agler's response to his condition – involves making subtle judgements about nuances of human behavior that are not appropriate at the summary judgment stage. Rather, these questions are best left to a jury to decide, with the aid of live testimony from the individuals involved.

Finally, the facts surrounding McGiboney's discharge from the medical unit on the night of  May 12, 2012 are simply too murky for the Court to say what happened with the level of certainty required at the summary judgment stage. McGiboney's case for summary judgment depends on the Court's willingness to make certain inferences from the DOR about what Dr. Agler and Nurse Purkiss discussed that night, just before McGiboney left the ER. One reasonable inference, of course, is that Dr. Agler simply reconfirmed his earlier diagnosis or diagnoses– i.e. of back spasm and malingering. But McGiboney's case for summary judgment also depends on the Court being willing to infer as a matter of law that no objective clinical reason existed to support McGiboney's discharge from the medical unit that night. Given McGiboney's unusual clinical presentation, and Dr. Agler's stated lack of knowledge about the history of AVM, the Court will not make either inference as a matter of law. Viewing the evidence in the light most favorable to Dr. Agler, a reasonable jury could very well conclude that

imperfections in his care of McGiboney, if any, fell short of the very high bar necessary to establish a deliberate indifference claim.

### ORDER

1.   Defendant's Motion for Summary Judgment (Dkt. 41) and Plaintiff's Motion for Summary Judgment (Dkt. 42) are hereby **DENIED.**

2.   Plaintiff's Motion to Strike (Dkt. 46 ) is **GRANTED**, for purposes of these motions only.



DATED:  **March 1, 2016**

_____
Honorable Ronald E. Bush
Chief U. S. Magistrate Judge